IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DUANE ANTHONY CAIN, #299508 *
Petitioner,
v. * CIVIL ACTION NO. RDB-05-431

WARDEN SACCHET and *
THE ATTORNEY GENERAL OF THE
STATE OF MARYLAND *
Respondents.
******

**MEMORANDUM OPINION**

On February 14, 2005, the Clerk received for filing Duane Anthony Cain's ("Petitioner") 28 U.S.C. § 2254 attack on his 2001 first degree rape and robbery convictions in the Circuit Court for Baltimore County. (Paper Nos. 1 & 4). Respondents have filed an Answer to the Petition. (Paper No. 11). After consideration of the pleadings and exhibits, the Court sees no need for an evidentiary hearing. *See* Rule 8(a), *Rules Governing Section 2254 Cases in the United States District Courts; see also* 28 U.S.C. § 2254(d) & (e)(2). For reasons to follow, the Petition is hereby denied and dismissed with prejudice.

**I. Procedural History**

On June 26, 2000, Petitioner was indicted on counts of first degree rape and related offenses, including robbery and theft. (Paper No. 11, Ex. 1). The facts adduced at trial, as described by Baltimore County Circuit Court Judge Robert E. Cadigan's post-conviction opinion, are as follows:

> On the evening of June 11, 2000, Christine Pakacki, the victim in this case, was out with her friend Frank Price. T. 1/30/01, p. 85. Ms. Pakacki and Mr. Price were out drinking and Ms. Pakacki was using narcotics. T. 1/30/01, p. 85. Ms. Pakacki spent time with Mr. Price at a local bar, at Mr. Price's apartment and at her own apartment. T. 1/30/01, p. 85. There is no indication that Mr. Price used any narcotics, but he was aware of Ms. Pakacki's use of narcotics that evening. T. 1/30/01, p. 119. Mr. Price was also with Ms. Pakacki when she stopped at her friend "Whitey's" house a couple of times that evening.

T. 01/30/01, p. 86. Ms. Pakacki testified that she stopped at "Whitey's" house to purchase more drugs. T. 01/30/01, p. 86-87.

Mr. Price dropped Ms. Pakacki back at her apartment at approximately 4:00 a.m. on the morning of June 12, 2000. T. 01/30/01, p. 87. Mr. Price loaned Ms. Pakacki his cell phone so that she would have a phone she could use to call for a ride to her mother's house. T. 01/30/01, p. 88. Ms. Pakacki left her apartment between 5:30 a.m. and 6:00 a.m. to walk to her mother's house. T. 01/30/01, p. 88. On the walk to her mother's Ms. Pakacki one again stopped by "Whitey's" house but no one was home. T. 01/30/01, p. 88.

As Ms. Pakacki continued on her way to her mother's home, a man approached her and asked for a cigarette. T. 01/30/01, p. 88. Ms. Pakacki gave the man a cigarette and continued on her way. T. 01/30/01, p. 88-89. A few minutes later the man ran up behind Ms. Pakacki and she questioned him as to why he was running up behind her. T. 01/30/01, p. 89. The man said he was heading to the Social Services office. T. 1/30/01, p. 89. The man then sat down on the curb to wait for Social Servies to open. T. 1/30/01, p. 89. Ms. Pakacki felt apprehensive about the situation so she used Mr. Price's cell phone to call her sister. T. 01/30/01, p. 89. She told her sister that she thought she was being followed and asked her to stay on the phone. T. 01/30/01, p. 89. Her sister did not stay on the phone but rather she hung up on Ms. Pakacki. Ms. Pakacki continued walking to her mother's home. T. 01/30/01, p. 89.

The man approached her once again and Ms. Pakacki questioned him again. He said he worked in the area and Ms. Pakacki accepted this information and continued on her walk to her mother's home. T. 01/30/01, p. 90. As Ms. Pakacki walked the man came up from behind her grabbed her by the neck and dragged her under a bridge. T. 01/30/01, p. 91. Ms. Pakacki blacked out for a few mintues and then regained consciousness. T. 01/30/01, p. 91. The man then proceeded to have forcible sexual intercourse with Ms. Pakacki. T. 01/30/01, p. 91. After the rape, the man took the cell phone that had been in Ms. Pakacki's possession and money from her purse. T. 01/30/01, p. 91. Ms. Pakacki immediately ran to a local building for help and police were called. T. 01/30/01, p. 91.

The police, through their investigation, identified Mr. Cain as a suspect in this case. T. 01/30/01, p. 134. When the police went to question Mr. Cain at his home he was in possession of Mr. Price's cell phone, which had been given to the victim. T. 01/30/01, p. 140. Phone records indicate that Mr. Cain had been using Mr. Price's cell phone during the morning hours of June 12, 2000. T. 01/30/01, p. 141-422. Mr. Cain was questioned at the police station and subsequently arrested and charged with the rape and robbery of Ms. Pakacki. T. 01/30/01, p. 137, 155.

(Paper No. 11, Ex. 18 at 1-3).

The case proceeded to trial before Circuit Court Judge J. William Hinkel on January 30, 2001. On January 31, 2001, a jury found Petitioner guilty of first degree rape and robbery.[1] (Paper No. 11, Ex. 1; Ex. 3 at 89-91). Judge Hinkel sentenced Petitioner to a thirty-year term on the rape offense and a concurrent seven-year sentence on the robbery conviction. (*Id*., Ex. 3 at 96-97).

On appeal to the Court of Special Appeals of Maryland, Petitioner contended that the evidence was insufficient to sustain the conviction for first degree rape. (*Id*., Exs. 4 & 5). In an unreported opinion filed on February 8, 2002, the Court of Special Appeals of Maryland affirmed Petitioner's convictions. (*Id*., Ex. 6). A petition for *writ of certiorari* was filed and subsequently denied by the Court of Appeals of Maryland on June 11, 2002. (*Id*., Exs. 7 & 8).

On October 1, 2002, Petitioner filed for post-conviction review in the Circuit Court for Baltimore County. (*Id*., Ex. 9). He subsequently filed a number of amended and supplemental post-conviction petitions. (*Id*., Exs. 11, 12, 14, & 16). All claims raised Sixth Amendment ineffective assistance of counsel grounds, as set forth below:

A. Counsel failed to conduct a meaningful pretrial discovery with respect to the line of defense (consensual sexual conduct);

B. Counsel failed to investigate and challenge the expert testimony provided by Dr. Breitenecker with respect to the cause and existence of a petechial hemorrhage in the victim's eye region;

C. Counsel failed to investigate whether DNA testing results noted another semen deposit other than Petitioner's and did not challenge the DNA test results with respect to additional genetic markers;

D. Counsel failed to object to and request a curative instruction to the prosecutor's improper closing argument regarding the testimony of Dr. Breitenecker;

---

[1] Counts of attempted first degree rape, second degree rape, attempted second degree rape, third degree sexual offense, attempted third degree sexual offense, fourth degree sexual offense, attempted fourth degree sexual offense, second degree assault, and theft were abandoned by the State. (Paper No. 11, Ex. 1).

E. Counsel failed to object to the State's failure to disclose the testimony of an expert witness;

F. Counsel did not conduct meaningful pretrial discovery of the case by failing to investigate fact witnesses or consult expert witnesses;

G. The cumulative effect of trial counsel's errors deprived Petitioner of his right to the effective assistance of counsel;[2]

H. Counsel failed to object or take exception to the admission of expert testimony at trial from a medical physician that had been absent from his profession for a significant period of time;

I. Counsel failed to admit a record of the victim's criminal history in order to establish that her behavior was consistent with the defense theory of the case;

J. Counsel failed to specifically identify and investigate potential exculpatory testimony of an individual known as "Whitey;"

K. Counsel failed to interview the alleged victim in order to investigate the validity of facts and to prepare for effective cross examination;

L. Counsel failed to interview the SAFE[3] nurse in preparation for trial;

M. Counsel failed to interview Detective Gary Cross prior to trial in order to investigate facts of the case for trial preparation;

N. Counsel failed to consult and call to the stand an addictions specialist to establish behavior patterns of crack cocaine users that were consistent with the victim's behavior; and

O. Counsel failed to object to and request a curative instruction to the prosecutor's improper closing argument regarding the testimony of Calvin Rogers.

(Paper No. 11, Exs. 9, 11, 12, 14, & 16).

---

[2] In his amended petition for post-conviction relief filed on February 24, 2003, Petitioner also reiterated his claims that counsel failed to: (i) consult an expert witness with regard to challenging the intended testimony of Dr. Breitenecker on the cause and existence of petechial hemorrhage in the victim's eye region; (ii) investigate DNA evidence to determine whether there was a semen deposit other than Petitioner's; and (iii) object or take exception to the prosecutor's improper closing argument. (Paper No. 11, Ex. 12).

[3] SAFE is the acronym for sexual assault forensic examiner.

On January 30, 2004, a post-conviction hearing was held before Baltimore County Circuit Court Judge Robert E. Cadigan. (*Id*., Ex. 1). Judge Cadigan denied post-conviction relief on March 23, 2004. (Paper No. 11, Ex. 18). Petitioner filed an application for leave to appeal in the Court of Special Appeals, presenting the following issues for review:

A. Counsel failed to conduct meaningful pretrial discovery;

B. Counsel failed to investigate and challenge the expert testimony of Dr. Breitenecker with respect to the cause and existence of a petechial hemorrhage in the victim's eye; and

C. Counsel failed to object and request a curative instruction to the state's "improper" closing argument with regard to the testimony of Calvin Rogers.

(*Id*., Ex. 19).

On January 12, 2005, the Court of Special Appeals summarily denied the application for leave to appeal. (*Id*., Ex. 20). The appellate mandate was issued on February 14, 2005. (*Id*.).

Petitioner filed an original and amended § 2254 Petition in February and March of 2005, alleging that his 2001 convictions should be overturned based upon the ineffective assistance of trial counsel Timothy P. Knepp. Petitioner claims that:

I. Counsel failed to conduct a meaningful pretrial discovery of the case by not investigating fact witnesses or consulting expert (medical) witnesses and failed to pursue the defense of consent or make an investigation into the reputation of the white prosecutrix;

II. Counsel failed to consult an expert witness to mount a challenge to the intended testimony of Dr. Breitenecker on the cause and existence of petechial hemorrhage in the victim's eye region, which was made to support a claim of strangulation and, if proven, enhanced the severity of the charged offense;[4]

---

[4] According to the direct testimony of Dr. Breitenecker, a petechial hemorrhage about the eye region is "very strongly indicative of some mechanical obstruction....of the chest to the neck," and is the "most common cause in [a 30 year old woman's] age group." Paper No. 11, Ex. 3 at Tr. 14. On cross-examination, Dr. Breitenecker acknowledged that there were other possible, but unlikely, physiological causes

III. Counsel failed to object or take exception to the prosecutor's improper closing comments, which misstated the testimony of State's expert witness Dr. Breitenecker and State's witness Calvin Rogers;

IV. The cumulative effect of trial counsel's errors deprived Petitioner of his right to the effective assistance of counsel; and

V. Counsel failed to investigate whether there was another semen deposit other than Petitioner's and did not attempt to locate experts from the DNA field to challenge the State's case and to support the theory that another semen deposit was present.

(Paper No 1. at Attachments 1-15; Paper No. 4).

## II. Threshold Considerations

### A. Exhaustion of State Remedies

Under *Rose v. Lundy*, 455 U.S. 509 (1982), before a petitioner may seek habeas relief in federal court, he is required to exhaust each claim presented to the federal court by pursuing all available remedies in state court. This exhaustion requirement is satisfied by seeking review of the claim in the highest state court with jurisdiction to consider the claim. *See* 28 U.S.C. § 2254(b) and (c). In Maryland, this may be accomplished by proceeding with certain claims on direct appeal to the Court of Special Appeals (and thereafter seeking *certiorari* to the Court of Appeals) and with other claims by way of a post-conviction petition, followed by seeking leave to appeal from the Court of Special Appeals. Petitioner no longer has direct appeal or post-conviction remedies available in connection with the claims raised before this Court. He has exhausted the claims presented here.

### B. Statute of Limitations

There is no contention that the Petition is time-barred pursuant to 28 U.S.C. §2244(d).

### C. Procedural Default

---

for the hemorrhaging. (*Id*., Ex. 3 at Tr. 14-18).

Respondents assert that Petitioner is procedurally defaulted from raising his fourth and fifth Sixth Amendment claims regarding the cumulative effect of counsel's ineffectiveness and the failure to investigate another possible source of the semen deposit, because those claims were not raised in his application for leave to appeal Judge Cadigan's post-conviction decision.

The procedural default doctrine ensures that "state courts have had the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding." *See Picard v. Connor*, 404 U.S. 270, 276 (1971). In *Wainwright v. Sykes*, 433 U.S. 72, 85 (1977), the Supreme Court held that consideration of a claim in a petition for habeas corpus can be barred by failure to comply with state procedural rules, unless petitioner makes a showing of cause for the failure and prejudice resulting from the failure. Thus, claims which have never been presented in the state courts--or claims which were not exhausted properly in the state courts--are procedurally defaulted if presentation of the claims in state court would be barred by state procedural rules. *See Collier v. Jones*, 910 F.2d 770, 773 (11th Cir. 1990).

The Court agrees with Respondents. Petitioner's fourth and fifth Sixth Amendment grounds raised here were not presented in Petitioner's application for leave to appeal and are therefore procedurally defaulted. Even where a claim has been procedurally defaulted, however, this Court must still consider whether it should reach the merits of the defaulted claim in order to prevent a fundamental miscarriage of justice. *See Schlup v. Delo*, 513 U.S. 298, 318-20 (1995). The miscarriage of justice standard is directly linked to innocence. *Id*. at 320. Innocence is not an independent claim; rather, it is the "gateway" through which a petitioner must pass before a court may consider constitutional claims which are defaulted. *Id*. at 314. The miscarriage of justice exception applies where a petitioner shows that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *See Murray v. Carrier*, 477 U.S. 478, 496 (1986); *Schlup*, *supra*. To meet this standard a petitioner must show that it is more likely than

not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. *Schlup,* 513 U.S. at 327.

*Schlup* observes that:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare....To be credible, such a claim requires petitioner to support his allegations of constitutional error with new reliable evidence--whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence--that was not presented at trial.

*Id*. at 323.

Petitioner has been afforded an opportunity to demonstrate the existence of cause for his failure to raise his claims in the state courts properly and prejudice resulting from this failure. He has not made the requisite showing. Petitioner has projected no evidence, nor suggested that any exists, which could satisfy the difficult standard set forth in *Schlup*. Petitioner's procedurally defaulted claims are, therefore, foreclosed from federal habeas review.

**II. STANDARD FOR § 2254 REVIEW**

Because this Petition was filed after April 24, 1996, it is to be decided under amendments to the habeas corpus statutes contained in the Antiterrorism and Effective Death Penalty Act ("AEDPA"). *See Woodford v. Garceau*, 538 U.S. 202, 207 (2003); *Beck v. Angelone*, 261 F.3d 377, 380 n.3 (4th Cir. 2001). AEDPA modified the federal court's role in habeas proceedings in order to prevent federal "retrials" and to ensure that state court convictions are given effect to the extent possible under law. *See Bell v. Cone*, 535 U.S. 685, 693 (2002). Pursuant to statute, a federal court may not grant a writ of habeas corpus unless the state's adjudication on the merits:

> 1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Section 2254(d) is a "highly deferential standard for evaluating state-court rulings," *Lindh v. Murphy,* 521 U.S. 320, 333, n.7 (1997), "which demands that state court decisions be given the benefit of the doubt," *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (*per curium*). In *Williams v. Taylor*, 529 U.S. 362 (2000), Justice O'Connor explained that a state court decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Id*. at 412-413. A state court decision is based on an "unreasonable application" of clearly established federal law when "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id*. "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id*. at 409-410; *see also Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003); *Booth-el v. Nuth*, 288 F.3d 571, 575 (4th Cir. 2002).

Further, federal courts must give great deference to a state court's factual findings. *See Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000). Section 2254(e)(1) provides that a determination of a factual issue made by a state court shall be presumed to be correct absent clear and convincing evidence to the contrary. The applicant has the burden of rebutting the presumption of correctness. A decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on

factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding. *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

With these standards in mind, the Court will address the merits of the non-defaulted claims.

**III. PETITIONER'S SIXTH AMENDMENT CLAIMS**

To establish a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984), a convicted defendant must demonstrate that his counsel's performance (1) "fell below an objective standard of reasonableness," and (2) that counsel's deficient performance prejudiced the defendant. *Id*. at 688, 692. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id*. at 686. The ultimate focus of the *Strickland* inquiry is on the "fundamental fairness of the proceeding whose result is being challenged." *Id*. at 696.

In evaluating whether counsel's performance fell below an objective standard of reasonableness, a court must consider "whether counsel's assistance was reasonable considering all the circumstances." *Id*. at 688. In its analysis, a court must be "highly deferential," and "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id*. at 689 (internal quotations omitted). A court must not use the benefit of hindsight to second-guess strategic decisions made by counsel unless they were unreasonable. *Id*. at 690.

With regard to the prejudice prong of *Strickland*, a defendant need not demonstrate that the outcome of the proceeding would have been different, but rather that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Even if counsel committed a professionally unreasonable error, relief can

be granted only if "counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *See Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). Using the aforementioned *Strickland* criterion, the Court shall review each Sixth Amendment claim seriatim.

**Failure to Conduct Meaningful Pretrial Discovery**

Petitioner complains that trial counsel Timothy Knepp failed to conduct a meaningful pretrial discovery of the case in that he did not investigate fact witnesses, consult expert (medical) witnesses, pursue the defense of consent, or investigate the reputation of the victim.

In his post-conviction decision, Judge Cadigan found Petitioner's claims to be bald allegations that were not supported by law. (Paper No. 11, Ex. 18 at 8 & 16). Judge Cadigan correctly observed that trial counsel had presented defense witness Roland Johnson, who testified that: both the Petitioner and the victim were in his home on the night of the rape; they were talking and drinking together; they made at least two trips into the back room of his home together; this "back room" was a private area which Johnson allowed people to "do whatever they decide to do;" and Petitioner and the victim left his house together. (*Id*.). Further, Judge Cadigan noted that Petitioner was called to the witness stand by trial counsel, who elicited testimony that: Petitioner had met the victim at Johnson's home that late night; Petitioner talked, drank, and did drugs with the victim; and the victim, having run out of money to buy drugs, exchanged sex for crack cocaine. (*Id*., Ex. 18 at 8-9).

Judge Cadigan concluded that counsel's presentation of the case "supported the defense theory of consensual sex and is evidence of pretrial discovery." (Paper No. 11, Ex. 18 at 9). He further held that evidence regarding the victim's alleged habitual behavior of trading sex for drugs would have been prohibited by Maryland's Rape Shield Statute, Md. Code Ann., Crim. Law Art., § 3-319 (2002) (formerly Md. Code Ann., Art. 27, § 461A (2000), and that as Petitioner testified that he had never met the victim

prior to the night of the rape, it would seem "highly improbable that he was familiar with the habitual practices of the victim in relation to sex, drugs, or anything else." (Paper No. 11, Ex. 18 at 9; *see also* Ex. 18 at 16). Moreover, having reviewed the testimony of victim Christine Pakacki, Judge Cadigan found that Knepp conducted a thorough and meaningful cross-examination of the victim relating to her drinking and drug use that night and the various residences she visited in her ongoing search and use of drugs the night of the rape. (*Id.*, Ex. 18 at 9-10). He concluded that the transcript indicated that counsel was prepared and effective in his presentation of the defense witnesses, as well as the cross-examination of the victim. Judge Cadigan found that there was no showing that counsel failed to conduct meaningful discovery. (*Id.*, Ex. 18 at 15).

Upon review of the trial transcript, the Court sees no reason to overturn Judge Cadigan's decision. His findings do not involve an unreasonable application of *Strickland* and more than satisfy the § 2254(d) standard of review.

**Failure to Challenge the Testimony of Dr. Breitenecker**

Petitioner next complains that Knepp failed to consult an expert witness to mount a challenge to the intended testimony of Dr. Breitenecker as to the cause and existence of petechial hemorrhage in the victim's eye, which supported the victim's claim of strangulation. Judge Cadigan rejected this precise claim, stating that:

> Additionally, Petitioner contends that trial counsel failed to investigate the causes of petechial hemorrhages or consult an independent expert who could testify as to how such hemorrhages are created. Petitioner contends that had counsel researched the hemorrhages the jury may have been presented with an alternative theory regarding the formation and cause of the hemorrhage. This contention is inaccurate because counsel did cross-examine Dr. Breitenecker as to the causation of petechial hemorrhages and Dr. Breitenecker was clear that there are several ways that the hemorrhages can occur in the eye. T. 01/31/01, p. 14-18. There is no indication that counsel failed to conduct a meaningful investigation or engaged in a less than thorough cross-examination of Dr.

> Breitenecker. Consequently, the Petitioner has failed to prove that counsel was deficient; rather Petitioner appears to be making bald allegations which lack factual and legal support and for that reason Petitioner's second allegation is denied.

(Paper No. 11, Ex. 18 at 12).

The Court has examined the trial transcript and noted the testimony of the State's expert witness, Dr. Breitenecker, who had retired prior to the January, 2001 trial after 25 years as the director of the rape care center at the Greater Baltimore Medical Center. Petitioner does not, nor can he, argue that Dr. Breitenecker was not qualified to speak on the issue of petechial hemorrhaging. Knepp extensively cross-examined Dr. Breitenecker with regard to the causative factors for and age of a petechial hemorrhage in the eye, in order to establish that the victim's injury could have been caused by a variety of factors and could have occurred before the night of the rape. (*Id*., Ex. 3 at 14-18).

As correctly noted by Respondents, the fact that counsel was unable to elicit testimony from Dr. Breitenecker that favored the defense does not mean that counsel was unprepared or rendered ineffective assistance. Again, after review of the trial transcript[5] and Judge Cadigan's decision, the Court finds no reason to overturn the state court determination with regard to this Sixth Amendment claim.

**Failure to take exception to State's Attorney's Closing Argument**

The third ineffective assistance of counsel claim concerns the allegation that counsel failed to object or take exception to the prosecutor's closing argument, which contained misstatements

---

[5] The transcript shows that there was other admitted testimonial and physical evidence from the SAFE nurse and rape kit regarding the victim's injuries which supported the theory that the victim had been forced to have sexual intercourse. (Paper No. 11, Ex. 2 at 161-163).

regarding the testimony of State's witnesses Dr. Breitenecker and Calvin Rogers.[6]

During direct testimony, Dr. Breitenecker indicated that the petechial hemorrhaging found in the victim's eye was strongly indicative of some mechanical obstruction of the chest- to-neck region and, on cross-examination, he discussed petechial hemorrhages caused by choking. (Paper No. 11, Ex. 3 at 14-15 & 18). The prosecutor briefly addressed this testimony during closing argument, commenting that the victim's petechial hemorrhages and abrasions on neck supported her claim of strangulation and that the petechial hemorrhaging Dr. Breitenecker discussed "is associated with a healthy woman with the act of strangulation." (Paper No. 11, Ex. 3 at 60).

In his post-conviction decision, Judge Cadigan made the following observation:

> The Court has reviewed the transcript of the trial testimony of Dr. Breitenecker and has found no misstatement on the part of the State. During testimony, Dr. Breitenecker refers to petechial hemorrhages being caused by choking. T. 01/31/01, p. 18. The testimony of the doctor refers to both mechanical obstructions to the neck and to choking, hence the use of the term strangulation during closing argument is not a misstatement. Even though "strangulation" was not the exact term used by the doctor, the failure of defense counsel to object to a term so similar in meaning to "choking" cannot be said to be deficient performance under *Strickland*.

(Paper No. 11, Ex. 18 at 13).

During direct testimony Calvin Rogers, who had been taken into custody as a rape suspect on the morning of June 12, 2000, acknowledged that while under arrest he told an officer that he had seen a man by the name of "Duane" in the area of the incident wearing fatigues or camouflage pants and that "Duane" worked at H. C. Howell [Trash Company], a business in the area. (Paper No. 11, Ex. 3 at 5-6). While on the stand Rogers modified his story to indicate that he had only "glimpsed" the person known to him as

---

[6] There is some question whether Petitioner's claim regarding the prosecutor's misstatements as to Dr. Breitenecker's testimony is procedurally defaulted, as it was not presented to the Court of Special Appeals on review from Judge Cadigan's decision. (Paper No. 11, Ex. 19). Respondents do not, however, raise a procedural default argument as to this ground

"Duane" on the morning of the rape. (*Id*.). During her closing argument, State's Attorney Robin Coffin made the following statements:

> It wasn't Christine Pakacki who put [Defendant] on Stansbury [Road]. It was Calvin Rogers.
>
> And when [Defendant] says [he was] not on Stansbury [Road], he is lying because Calvin Rogers puts him there.

(*Id*., Ex. 3 at 61 & 82; *see also* Ex. 19 at 7).

After review of Calvin Rogers' testimony and the State's closing statement, Judge Cadigan found that the State did not misstate the testimony of Rogers and that counsel, accordingly, had no reason to object. (*Id*., Ex. 18 at 20). He noted that:

> Although the State's closing argument did not mirror the testimony given by Mr. Rogers, it was not a gross misstatement on the part of the State, nor was there any prejudicial error by defense Counsel's failure to object to the closing statement. The State's closing statement reflected the testimony of Mr. Rogers which was that he gave the police the name of Duane Cain as the person he "glimpsed" in the Stansbury Road area. T. 01/31/01, p. 3-6. Defense Counsel's lack of objection fails to meet the level of "unreasonable professional judgment" or being below the "objective standard of reasonableness" that is required to show that Counsel's performance was deficient under the first prong of *Strickland*. *Tichell*, 306 Md. at 441. Having failed to satisfy the first prong of *Strickland*, Petitioner's claim that Counsel was ineffective for failing to object to the State's characterization of Mr. Rogers' testimony is not a valid ground for Post Conviction relief.

(*Id*., Ex. 18 at 20).

The Court has examined the court record and pleadings and finds no reason to overturn Judge Cadigan's determinations with regard to this issue. The court finds that the post-conviction court's rulings

were reasonable under applicable Supreme Court precedent and constitute a correct assessment of the factual record.[7] *See* 28 U.S.C. §§ 2254(d) & (e).

## IV. CONCLUSION

For the aforementioned reasons, this Petition for habeas corpus relief shall be denied and the case shall be dismissed with prejudice. A separate Order follows.

Date: July 27, 2005

/s/
RICHARD D. BENNETT
UNITED STATES DISTRICT JUDGE

---

[7] As already indicated, Petitioner's fourth and fifth grounds relating to the cumulative effect of trial counsel's errors and counsel's failure to investigate the DNA evidence for exculpatory purposes are procedurally defaulted. Notwithstanding this finding, even were the Court to review these claims, it would find that neither claim warrants habeas corpus relief in light of the trial record and Judge Cadigan's post-conviction determination.

Judge Cadigan found Petitioner's cumulative error claim a generalization of all the other unsuccessful ineffective assistance claims and did not consider the allegation separately. (*See* Paper No. 11, Ex. 18 at 17). Where, as here, none of the issues raised by Petitioner could be considered error, he cannot string them together in hopes of forming a constitutional violation. *See Fisher v. Angelone*, 163 F.3d. 835, 852-53 (4th Cir. 1998) (noting that with respect to claims of attorney error, like claims of trial court error, the cumulative-error analysis appraises only the effect of matters actually determined to be constitutional error and not the cumulative effect of all matters deemed deficient).

With regard to Petitioner's Sixth Amendment claim regarding the DNA evidence, Judge Cadigan noted that the DNA report, which provided the results of the DNA test, stated that no unidentified semen was found. (*See* Paper No. 11, Ex. 18 at 12). This determination is supported by the record, which showed that Petitioner shared all 13 of the genetic markers tested in the DNA procedure. (Paper No. 11, Ex. 2 at 168-169). Therefore, counsel had no reason to object to DNA evidence or to otherwise investigate the test results.